UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| **MARY ROSE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **CAUSE NO.  1:16-CV-3212 TWP-MJD** |
| | ) |
| **FRANCISCAN ALLIANCE, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff, Mary Rose, hereby submits her response to Defendant's Motion for Summary Judgment.

### I.      Introduction

Mary Rose (hereinafter 'Rose") was formerly an active employee of Franciscan Alliance, Inc. (hereinafter "Franciscan", "the Hospital", "St. Francis", or "Defendant").  She suffers from various health conditions, and Franciscan concedes that she is disabled as that term is defined by the ADA.  Defendant challenges, however, that Rose is a Qualified Individual with a Disability (a "QUID") or that she suffered an adverse employment action.  As the disputed materials facts set forth herein contradict Franciscan's contentions, summary judgment must be denied.

Contrary to Franciscan's claims that Rose was an obstructionist, the disputed evidence demonstrates otherwise.  As Franciscan points out, it is this Court's duty to determine the cause of the breakdown in the interactive process and then assign responsibility.  The evidence in a light most favorable to Rose reflects that 1)  Franciscan asked for a doctor's note from Rose; 2) that Rose requested what the note needed to say to gain her the .8 FTE Patient Access position

1

(hereinafter ".8 FTE position") she applied for and was promised; 3) that Rose was told the note had to include specific language; 4) that the doctor's note submitted matched the language requested; 5) that Defendant – an entity that is well versed in HIPPA obligations – nevertheless contacted Rose's doctor without first acquiring a release and was told that with a release the clarification would be provided; 6) that no request was ever made of Rose to provide a HIPPA release; and 7) no clarification of the doctor's note was ever requested from Rose despite Rose sending no fewer than 4 emails to inquire about the status of her candidacy for the position.

Franciscan tries to distract the Court with its hearsay evidence that Rose instructed her doctor not to cooperate.  Again, the evidence in the light most favorable to Rose is that she instructed her doctor to provide information after obtaining a HIPPA release, and the doctor reported that information and nothing more to Defendant.  Defendant is attempting to utilize information it discovered in 2017 to justify its failure to follow privacy protocol or to seek any clarification from Rose in 2015.  Franciscan was responsible for the breakdown in the interactive process, and it is this failure that is the cause of Rose's harm.

Moreover, Defendant is simply wrong in its assertion that Rose cannot assert a prima facie case of unlawful disability discrimination.  Franciscan admits that Rose was a 'valued employee with a very strong work ethic" and that she is disabled.  Rose was denied the .8 FTE position – an adverse employment action – in favor of an individual (who has no known disabilities) assigned after Rose was rejected as the sole candidate.  Defendant's reliance on the doctor's note as its legitimate basis to have denied Rose a position is problematic.  Franciscan lied about clarification from the doctor's office not being forthcoming (it was told it could gain clarification if it obtained a HIPPA release); its agents never sought clarification from Rose

2

about the note; and its general counsel tries to polish her misrepresentations to the EEOC as an 'honest mistake' (regarding Franciscan's assertion that Rose's doctor indicated the note applied to both positions she worked). As to this last point, the evidence demonstrates said counsel did not even speak to the *only* Franciscan employee who spoke to Rose's doctor's office so it was made up out of whole cloth. This 'mistaken' misrepresentation is but one of three different stories told by Defendant as to what Dr. Young's office told Franciscan.

What should be equaling – or more - troubling to the Court is Defendant's 'oh by the way' we don't hire employees above 1.0 FTE defense. This defense appears for the *first time* in Rhodes affidavit signed on September 25, 2017 (the close of discovery) and Jones' affidavit signed on November 7, 2017. No one ever told Rose this was a basis for denial. Curiously, it was not argued by Jones, Franciscan's general counsel since 2001, to the EEOC. Continuing, Franciscan did not assert a mixed-motive defense, an affirmative defense that must be raised at the pleading stage; it was not asserted as a reason for denial in response to a very specific interrogatory timely served by Rose; that Jones was never identified as a potential witness by Defendant. Both Jones and Rhodes contributed to responding to Plaintiff's Interrogatory answers and elected not to divulge this reason in its answers served on July 25, 2017 on Plaintiff.

At best this new evidence serves to support Rose's contention that Franciscan has now created a shifting defense issue that further supports her ADA claims and makes summary judgment even more improper. At worst, Franciscan has engaged in deceptive discovery practices that this Court should not reward. Rose is left with no mechanism to test whether such policy truly exists or whether there is anyone at Franciscan who enjoys more than a 1.0 status to debunk that it applies this rule evenly to all employee. To quote Shakespeare's character

3

Marcellus in <u>Hamlet</u>, "Something is rotten in the state of Denmark."

For the reasons stated herein, Rose respectfully requests that this Court DENY Franciscan's motion for summary judgment.

## II.    <u>Statement of Material Facts in Dispute</u>

<u>Assertion</u>:    [Page 3, Paragraph[1] 1, lns. 2-7.[2]]

<u>Response</u>:    These facts are immaterial and irrelevant.  There is nothing in the record presented to suggest Edna Livelsberger played any part in the claims brought by Rose.

<u>Assertion</u>:    Importantly, Franciscan Alliance's HR Department won't allow the hiring of an applicant above a 1.0 FTE Status.  [P. 4, Para 1, lns. 10-12.]

<u>Response</u>:    Objection and disputed.  For the reasons explained in later sections of this brief, Plaintiff asserts, in the alternative, that this fact provides evidence of a shifting defense by Defendant or otherwise should be stricken from the record.

<u>Assertion</u>:    Francsican engaged in the interactive process with Rose by among other things, providing Rose with the accommodation of working Triage.  [P. 2, Para 2, lns. 6-7.]

<u>Response</u>:    Objection.  This fact is a legal conclusion, not a factual assertion.  The fact that Franciscan claims it provided an accommodation to Rose to work in triage in mid-2015 is irrelevant and immaterial to the question of whether it engaged in the interactive process and afforded her an accommodation for the September/October 2015 .8 FTE position.

<u>Assertion</u>:    It was unclear to Franciscan whether this eight-day restriction applied to Rose's *Patient Access Position* with St. Francis Hospital, or whether the eight-day restriction

---

[1] Paragraph will hereinafter be referred to as "Para", page as "p" or pages as "pps."

[2] Plaintiff has not recited these facts as they add nothing to the disposition of the present matter.

applied to *any and all positions* held by Rose (including her Greenwood Imaging Center position.)  [P. 6, Para 4, lns. 17-19.]

<u>Response</u>:       Disputed.  Rose contends there was no confusion regarding the note.  Rose asked Sara Oliphant what the medical note from her doctor needed to say.  [Def's Exh. 35-9] Oliphant responded to Rose by telling her that the noted needed to say, "[Y]ou are able to ambulate distance to triage, that you are able to work the 8 days on a consistent basis".  [Def's Exh. 35-9].  The medical note provided by Rose to Oliphant matched the language that Oliphant told Rose she needed.  [Def's Exhibit, Filing No. 35-9; Oliphant Dep., p. 49, lns. 2-4.]  The Imaging Center does not have a triage department.  [Rose Aff., Para. 16].

<u>Assertion</u>:       The physician office's office did not clarify what the eight-day restriction applied to.  [P. 7, Para 2, ln. 14.]

<u>Response</u>:       Disputed because it does not divulge the full context.  Rose's doctor indicated it would provide clarification if Defendant procured a HIPPA release from Rose.  [See Def's Exhibit 35-12, p. 4, R. Alford Entry 9.25.2015, 4:08 p.m. entry.]  St. Francis never provided a HIPPA release to Dr. Young's office.  [Dr. Young Dep., p. 65, lns. 10-14].

<u>Assertion</u>:       Unbeknownst to anyone at Franciscan, Rose contacted Dr. Young's office on or about September 25, 2015 and specifically instructed the office representative *not* to provide any clarifying information from Dr. Young's office to Franciscan regarding the September 24, 2015 doctor's note.  [P. 7, Para 2, lns. 18-22.]

<u>Response</u>:       Disputed.  Rose disavows telling anyone not to cooperate with Franciscan.  [Rose Aff., Para 9].  Rather, Rose was unhappy that no one at Franciscan told her they would be contacting her doctor without her permission.  [Rose Aff., Para 8].  As a health care employee,

Rose knows that to discuss a patient's medical condition requires a HIPPA compliant release. [Id.]  Rose took no further action as she was told by her the office that they would report to Franciscan that it needed to submit a written release to my doctor.  [Rose Aff., Paras. 11 & 12].

Assertion:      Importantly, the reason why Franciscan never received clarification is because Rose, on or about September 25, 2015, specifically instructed Dr. Young's office not to provide any clarifying information from Dr. Young's office to Franciscan regarding the September 24, 2015 Doctor's note.  [P. 10, Para 1, lns. 4-7.]

Response:      Disputed.  As noted directly above in response to the previous disputed fact, Rose never gave that instruction to any member of Dr. Young's staff. [Rose Aff., Para 9]. Franciscan never received clarification because it never sought a HIPPA release from Rose or sought clarification from Rose.  [Rose Aff., Paras. 13 & 14].  No one at Dr. Young's office asked Rose to execute a HIPPA release.  [Rose Aff., Para 13].  Rose's doctor indicated it would provide clarification if Defendant procured a HIPPA release from Rose and reached out Franciscan to get one from it.  [See Def's Exhibit 35-12, p. 4, R. Alford Entry 9.25.2015, 4:08 p.m. entry.]  St. Francis never provided a HIPPA release to Dr. Young's office.  [Dr. Young Dep., p. 65, lns. 10-14).

Assertion:      Dr. Young testified that the reason his office never responded to Franciscan's request for clarification was because Rose directed Dr. Young's office not to say anything.  Maluck testified to this as well.  [P. 10, Para 3, lns. 12-15].

Response:      Disputed.  Rose told Dr. Young's office that she did not want anything to be submitted until a HIPPA release was obtained.  [Rose Aff., Paras 9 & 11].  Dr. Young's office could not provide any clarification without a written release as they have to get a HIPPA release

before discussing a patient's medical records with anybody.  [Young Dep., p. 34, lns. 23-25, p.

36, ln. 1].  Dr. Young's office never asked that Rose sign a release, but, rather, assured her they

would get it from St. Francis. [Rose Aff., Paras. 11 & 13].  Dr. Young's office never received a

HIPPA release from St. Francis.  [Dr. Young Dep, p. 65, lns. 10-14].  A verbal directive from

Rose would have been ineffective nonetheless.  [Dr. Young Dep., p. 67, lns. 13-15].  Maluck

testified that irrespective of what Rose said Maluck couldn't act without Rose's written

permission.  [Maluck Dep., p. 41, lns. 19-22; p. 42, lns. 9-11].

> Assertion:      Jones mistakenly noted that Dr. Young's office confirmed that the .8
> limitations were inclusive of Rose's St. Francis Hospital and Greenwood Imaging Center
> positions.  [P. 14, Para 1, lns. 1-4].

> Response:      Disputed.  Rose contends there was no basis for Jones to conclude this,
> and that the factual context surrounding this misrepresentation lends itself to an argument of
> pretext even though Jones belatedly attempts to withdraw her representation.  Only Sara Oliphant
> spoke to Dr. Young's office.  [Def's Answers to Pl. Interrogatories Nos. 9 & 10].  The position
> statement submitted by Defendant to the EEOC indicates what Jones claims she mistakenly
> noted.  [Def. Exh. 35-23].  Defendant's Interrogatory Answers indicates that the, "Physicians'
> office representative discussed the offices restrictions on providing health info to Ms.
> Oliphant…"  [Def's Answers to Pl. Interrogatory No. 9].  Sara Oliphant disavowed that that Dr.
> Young's office ever told her what Jones 'mistakenly noted' and the interrogatory answer, that
> she was only told Dr. Young's office would have to get back to her.  [Oliphant Dep, p. 53, lns.
> 22-25, p. 54, lns 1-2, p. 57, lns. 3-6, p. 67, lns. 21-24].  Oliphant's only communication about
> what her discussion with Dr. Young's office is a single email she sent to Carrie Ball on October

8, 2015.  [Oliphant Dep., p. 54, lns 18-23, Def. Exh. 35-13].

      <u>Assertion</u>:     When Rose indicated interest in the .8 FTE Patient Access Position,

Franciscan never told Rose that the .8 FTE position was hers for the taking pending a satisfactory

physician's note.  [P. 15, Para. 1, lns. 5-7].

      <u>Response</u>:     Disputed.  Sara Oliphant told Rose that there were no other candidates and

the job was hers if Rose provided the doctor's note that Sara had requested.  [Rose Aff., Para 3].

      <u>Assertion</u>:     When Franciscan received the September 2015 .8 FTE restriction,

Franciscan sought clarification; neither Dr. Young nor Rose clarified the restrictions.  [P. 15,

Para. 1, lns. 8-10].

      <u>Response</u>:     Disputed.  As cited herein above, Dr. Young's office could not provide

clarification without receiving a HIPPA release from St. Francis.  Dr. Young's office advised

Sara Oliphant of the need for a release and never got one.  [See Def's Exhibit 35-12, p. 4, R.

Alford Entry 9.25.2015, 4:08 p.m. entry].  Moreover, Carrie Ball knew a HIPPA release was

required before Rose's doctor could provide clarification as all doctors are prohibited from

discussing a patient's medical condition without one.  [Ball Dep., p. 22, lns. 3-17].  She never

instructed Sara to request one.  [Id., lns. 8-12].  No one every sought clarification from Rose as

to whether the release referred to both of her positions or just the triage position.  [Rose Aff.,

Para. 14].

### III.    <u>Statement of Additional Material Facts</u>

**Mary Rose.**

    1.     Rose applied for a .8 FTE Patient Access position in September 2015.  [Rose Aff.,

Para. 2].

2.      Dr. Young's office prepared the note that Oliphant requested and faxed it to me at the Imaging Center.  I presented it to Oliphant on September 25, 2015.  [Rose Aff., Para. 5].

3.      Oliphant contacted my doctor's office without my permission.  Oliphant never asked for permission to speak to my doctor.  [Rose Aff., Para. 6].

4.      On September 25, 2015, Dr. Young's office called me and told me they had received a call from Oliphant about my medical records.  [Rose Aff., Para. 7].

5.      During my conversations with Dr. Young's office, no one told Rose that she could get information directly from the doctor and provide it to Oliphant or Franciscan herself. No one at Franciscan asked Rose to do this.  [Rose Aff., Para. 10].

6.      Dr. Young's office calmed Rose down and told her they would call Sara and tell her they needed a HIPPA release.  [Rose Aff., Para. 12].

7.      If anyone had ever asked Rose to sign a HIPPA release, she would have signed it. [Rose Aff., Para. 13].

8.      Rose spoke with Carrie Ball one time about her doctor's note.  Rose communicated with Sherri Clark on one occasion about her doctor's note.  They told Rose she was not getting the .8 FTE position because of the doctor's note.  These discussions involved whether the .5 FTE position at the Greenwood Imaging Center was somehow impacted by the note.  Neither Ball nor Clark ever told Rose they needed clarification as to what Dr. Young's note meant.  [Rose Aff., Para. 14].

9.      No one ever told Rose that was ineligible for the .8 FTE position because St. Francis has a policy prohibiting any individual to be employed in more than a 1.0 FTE capacity. [Rose Aff., Para. 15].

9

10.     Rose worked with Mary Ann Whitney at St. Francis.  Rose was unaware of any medical conditions or disabilities that Whitney has.  If Whitney has any, she did not disclose them to Rose.  Moreover, Whitney has no outward appearance of suffering from any disability. [Rose Aff., Para. 17].

11.     Rose sent an email to Sara Oliphant on September 30, 2015 asking for an update. [Pl.'s Exh 1].

12.     Rose sent an email to Sara Oliphant on October 2, 2015 asking if Oliphant had everything.  [Pl.'s Exh 2].

13.     Rose sent an email to Carrie Ball on October 7, 2015 and again on October 12, 2015 seeking an update.  [Pl.'s Exh 1].

14.     Prior to hearing from Sherri Clark, no one responded to these emails Rose submitted.  [Rose Aff., Para. 18].

**Sara Oliphant.**

15.     Sara Oliphant was a supervisor in patient access in 2015, and Mary Rose reported to her.  [Oliphant Dep, p. 10, lns. 15-18; p. 11, lns. 3-5].

16.     Rose provided Oliphant with a work restriction that matches the language that Oliphant told her she needed to receive.  [Oliphant Dep., p. 49, lns. 2-4].

17.     Oliphant claims Dr. Young's office told her they would have to get back to her, and that they couldn't answer her questions about the clarification of the doctor's note.  Oliphant did not call back, and she further contends the doctor's office never called her.  [Oliphant Dep., p. 22, lns. 7-10, 17-23].

18.     Oliphant knew the importance of HIPPA and testified 'We don't violate HIPPA.'

10

[Oliphant Dep., p. 19, lns. 14-17].  Nevertheless, Oliphant never asked Rose to execute a HIPPA release before or after she contacted Dr. Young's office.  [Rose Aff., Para. 13].

19.     Dr. Young's office did not tell Oliphant that the .8 limitation was inclusive of both positions.  [Oliphant Dep., lns 22-25].  Oliphant admits that she never told anyone this and that the representation in the position statement is false.  [Oliphant Dep., p.54, lns. 1-2, 8-10].

20.     No one ever told Oliphant that the September 24, 2015 work note related to Rose's position at the Imaging Center, too.  [Oliphant Dep., p. 67, lns. 21-23].

21.     Oliphant recalls that Rose did not get the .8 FTE position because Franciscan 'never got a response to the doctor's note.'  [Oliphant Dep., p. 76 lns. 4-9].

**Carrie Ball.**

22.     Ball made the decision to reject Rose for the .8 FTE position.  [Ball Dep., p. 8, lns. 12-16].

23.     Rose was not selected for the position because of her work restriction.  [Ball Dep., p. 19, lns. 15-20].

24.     Ball had spoken to Human Resources, Karen Smithers, about Rose.  [Ball Dep., p. 11, lns. 4-15].  Smithers told Ball that Rose could only work a total of .8 FTE.  [Ball Dep., lns 13-16].  Smithers did not tell Ball about any 1.0 FTE restriction that Franciscan had as alluded to by Jones and Rhodes.  [Id.]

25.     Neither Smithers nor Cindy Erickson, Human Resources, told Ball she should speak to Rose's doctor.  [Ball Dep., p. 12, lns. 24-25, p. 13, ln. 1; p. 14, lns 15-17].  Ball did not contact Dr. Young's office.  [Ball Dep., p. 13, lns. 12-13].

26.     Ball only recalls reaching out to Rose to see if she had an updated physician note

11

lifting her restrictions.  She did not otherwise seek clarification of the September 24, 2015 work

restriction.  [Ball Dep., p. 16, lns. 21-25, p. 17, lns. 1-2].  Ball only spoke to Rose on a single

occasion.  [Ball Dep., p. 43, lns. 1-5].

      27.     Ball expected Dr. Young's office not to speak with anyone without a HIPPA

release.  [Ball Dep., p. 21, lns. 20-23; p. 22, lns. 3-7].  Nevertheless, after receiving the October

8, 2015 email from Oliphant [Def's Exh 35-13] indicating Dr. Young would not clarify the note,

Ball did not advise her to get a release from Rose.  [Ball Dep., p. 22, lns. 8-12].

**Sherri Clark.**

      28.     It was Clark's job to see clarification from Rose.  [Clark Dep., p. 6, lns. 23-25, p.

7, lns. 1-2].

      29.     Clark only spoke with Rose one time.  [Clark Dep., p. 7, lns. 6-8].  Clark called

Rose to discuss the work restriction with her.  Clark recalls the purpose of the call to Rose was to

seek clarification from her; Clark does not recall what she said to Rose or what Rose said to her.

[Clark Dep., p. 10, lns. 9-21, p. 11, lns. 7-9].

      30.     The clarification Clark sought was not about whether the restriction applied to one

or both jobs, it was confirm Rose worked at the Imaging Center.  [Def.'s Exh. 35-13].  Clark's

email exchange with Rose simply reports that the .8 restriction applies to all of Franciscan's

entities.  [Def's Exh. 35-13].  Clark did not tell Rose that it was unclear to the hospital whether

the doctor's restriction applied to just the .8 FTE position or

      31.     Clark did not talk to Dr. Young's office.  [Clark Dep., p. 13, lns. 4-6].  No one in

Human Resources asked Rose to execute a HIPPA release so they could speak with Dr. Young.

[Clark Dep., p. 13, lns. 7-12].

**Dr. Young's Office.**

32.    Dr. Young was aware that Rose worked 2 jobs.  [Dr. Young Dep., p. 44, lns. 1-4]

33.    Dr. Young's note only applied to the Emergency Room / triage setting.  [Dr. Young Dep., p. 29, lns. 20-24].  His note also did not restrict Rose to working 32 hours per week. Rather, it limited her to work no more than 64 hours every pay period in the Emergency Room. [Dr. Young Dep., p. 28, lns. 9-17].

34.    Dr. Youg's office is trained not to take verbal consent to release a patient's medical information to a third party.  [Dr. Young Dep., p. 67, lns 13-15].

35.    Franciscan never presented a HIPPA release to Dr. Young's office.  [Dr. Young Dep., p. 65, lns. 10-14].  If it had, it would have learned that Franciscan misread his note.  [Dr. Young Dep., p. 52, lns. 8-10].

36.    Both Dr. Young and Robin Maluck agree that Rose's verbal representations to speak with someone about her medical records are ineffective.  [Dr. Young Dep., p.67, lns. 13-15; Maluck Dep., p. 41, lns 19-22; p. 42, lns. 9-11].

37.    Dr. Young's office contacted Oliphant and advised that they could speak to her about the clarifications once she obtained a HIPPA-compliant release.  [See Def's Exhibit 35-12, p. 4, R. Alford Entry 9.25.2015, 4:08 p.m. entry.]

## IV.    <u>Argument</u>

As explained in brief in Rose's introduction, Franciscan failed to engage in the interactive process in good faith.  It requested and received the doctor's note it said it needed before Rose was given the position.  Ignoring HIPPA laws, Franciscan attempted to informally get information from Rose's doctor's office.  Thereafter, it never sought a release from Rose nor

sought clarification from anybody as to what the note meant.  It failed even to respond to Rose's attempts to reach out and see if there was anything more she should do.

Moreover, Rose makes a prima facie case of disability discrimination as required by the ADA, and there is ample evidence to show that Franciscan's articulated explanation(s) for its action is not trustworthy.  For these reasons, Defendant's motion must be denied in its entirety.

## A.      Legal Standard

Federal Rule of Civil Procedure 56(c) states that summary judgment shall be granted only if there "is no genuine issue as to any material fact and the nonmoving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the nonmoving party's case.  Doe v. R.R. Donnelley & Sons, Co., 42 F.3d 439, 443 (7th Cir. 1994). To withstand a motion for summary judgment, nonmovant need neither match movant witness for witness nor persuade the Court that nonmovant's case is convincing;  nonmovant need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact.  Waldridge v. American Hoeschst Corp., 24 F.3d 918, 921 (7th Cir. 1994)(quoting Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  The record and all reasonable inferences drawn from it are viewed in a light most favorable to the party opposing the motion. Anderson, 477 U.S. at 247-252.

In the context of summary judgment under Rule 56, the Court must review the record "taken as a while."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 457 U.S. 574 (1986).  The standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that,

"the inquiry under each is the same." Reeves, 530 U.S. at 150; Anderson 477 U.S. at 250-251.

### B.    Defendant's Failure to Engage in the Interactive Process in Good Faith and to Accommodate Rose

An employee begins the accommodation process by notifying her employer of her disability; "at that point, an employer's liability is triggered for failure to provide accommodations." Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998). After an employee has disclosed she has a disability, the ADA requires an employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances. E.E.O.C. v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005)(quoting Gile v. United Airlines, Inc., 213 F.3d 365, 373 (7th Cir. 2000). As Defendant has noted, "identifying reasonable accommodations requires both [parties] to engage in a flexible interactive process." Brown v. Milwaukee Bd. Of School Directors, 855 F.3d 818, 821 (7th Cir. 2017)(emphasis added). Both parties are responsible for that process. Id.

Defendant cites the Steffes and Brown cases for the proposition that Rose, and not Franciscan, was the fault for the breakdown in the process. In Steffes, Plaintiff provided a blanket work restriction, and the company asked for updated information from the Plaintiff. Steffes failed to either provide the requested information or get more comprehensive assurances from her doctor. In Brown, the Court held Plaintiff to task for not providing clarifying information. For the reasons explained herein, these cases are not on point with the instant case.

The Beck case is also not square on the facts present here. The information that Rose was told she had to provide, she provided. That bears repeating; Oliphant told Rose what the note had to say and the note was identical to what Rose's supervisor said she needed.

Moreover, the hospital presumptively knew that that there were two ways to seek

clarification of the work note: 1) they could get a HIPPA release from Rose; or 2) they could simply ask Rose.  But the clear evidence in this case is that no one at Franciscan asked for a HIPPA release despite Dr. Young's office alerting Oliphant that it would provide the requested clarification if a HIPPA release was provided.  Rose understood that the ball was in the hospital's court given that her doctor indicated his office would address the issue of the release directly with Franciscan on her behalf.

Moreover, no one ever sought clarification from Rose.  Her testimony raises a disputed fact about this very issue as no one ever told her that Franciscan needed to know whether the note applied to both the Imaging Center position and the .8 FTE position.  Rather, there were conclusory remarks made by Ball and Clark – on one occasion each in mid-October – that they had to apply the hours worked at the Imaging Center to the 8-shift every two pay periods restriction when denying Rose the .8 FTE position.  When Rose appeared confused based on information set forth in their email exchanges, they still did not seek to clarify Franciscan's concern with the work note.  A cursory review of both Ball's and Clark's testimony, taken in conjunction with Rose's, that she was never asked to review the note.  Since no clarification was sought from Rose, the analogy to the Brown and Steffes cases also fails.

While it is true Oliphant tried to contact Dr. Young's office, she did so in a manner that she knew would not yield the sought-after information.  She was adamant that she was aware of and did not break HIPPA laws.  To thus try and gain medical information from Rose's doctor's without a release could only fail and should not be construed as an effort at all.  Oliphant called, expressed to Ball that the doctor wouldn't say anything about the note.  Oliphant's October 8th email fails to report that Dr. Young's office told her she would get the information she sought once

she provided the necessary HIPPA release.  This creates an issue of material fact as to whether Franciscan simply elected to take no further steps – given the disputed facts as to whether it sought clarification – to get information readily at hand.

Moreover, the hospital's diminutive effort to gain additional information about Rose's work note that matched what Oliphant required is more akin to decisions in <u>Bultemeyer v. Fort Wayne Comm. Sch.</u>, 100 F.3d 1281, 1286 (7th Cir. 1996)(employer should have sought an explanation from the doctor if it had concerns with the employee's medical diagnosis); <u>Spurling v. C&M Fine Pack, Inc.</u>, 739 F.3d 1055, 1060 (7th Cir. 2014) (Employer did not seek further clarification from either Plaintiff or her doctor and disregarded the medical evaluation altogether); <u>Miller v. Ill. Dep't of Corr.</u>, 107 F.3d 483, 486 (7th Cir. 1997)(explaining that employer must make a reasonable effort to explore the possibilities after learning of employee's request for accommodation).  If anyone is to be held at fault for any incongruity with the work restriction as written it should be Franciscan as it was written to match its own requirements and its failure to file basic, HIPPA requirements.

Franciscan also makes hay that Rose was both an obstructionist and that Franciscan agents reached out in an effort to obtain gain clarification as to what Dr. Young's September 24, 2015 work restriction note meant.  It asks this court to conclude that Rose was unilaterally responsible for the break down in the process, but the evidence indicates otherwise.  Moreover, it was Defendant's disingenuous approach to interactive process that led to the break down, and thus, the harm.

       i.      **Defendant Relies on Inadmissible Hearsay Testimony to Support its Claim that Rose was an Obstructionist.**

Franciscan points to statements attributed to Rose in notes made by Reggie Wessic in the

17

medical records obtained from Dr. Young's office.  These notes, taken by Wessic, report what

Rose allegedly said.  This constitutes inadmissible hearsay evidence.  Hearsay is a statement,

other than one made by the declarant while testifying at the trial or hearing, offered in evidence

to prove the truth of the matter asserted. Fed. R. Evid. 801(c).  Rose disavows ever instructing

Wessic or anyone at Dr. Young's office to not provide information to Franciscan; rather, Rose

was unhappy that Franciscan did not approach her to request a HIPPA release before contacting

Dr. Young and asked that her doctor comply with HIPPA requirements.  As Defendant cannot

point to any of the exceptions spelled out in Fed. R. Evid. 801(d)(2) that apply here, the

statement is hearsay and cannot be used to prove that Rose obstructed with Dr. Young's office

cooperating   Thus, Defendant has either offered no admissible evidence of obstructionist

behavior or there are material disputed facts as to Rose's alleged behavior.

        ii.        Rose Fulfilled Her Legal Obligations to Participate in the Interactive Process

        The record is replete with actions Rose took to assist and cooperate with Franciscan to

assure it that she could work the .8 FTE position.  After Rose applied for the position, she

received a listserv message from Oliphant indicating they were accepting applications for various

open positions.  After asking if she needed to reapply, Oliphant told Rose that she needed a

doctor's note.  Rose asked what the note needed to say, Oliphant responded in detail and without

qualification, and there is no dispute that Dr. Young's office provided the very note that was

requested.

        Rose hand-delivered the doctor's note to Oliphant one day after receiving the work

restriction from Dr. Young.  Unbeknownst to Rose, Oliphant then called Dr. Young's office.

Rose was noticeably upset when Dr. Young's office called her to say that Oliphant was on the

line requesting medical information, as Oliphant did not approach Rose requesting that she execute a HIPPA release to speak with Dr. Young. Rose only asked her doctor to follow HIPPA's mandates and request a release first; she was unaware of other methods that might be used to provide supplemental information to Franciscan. Importantly, Dr. Young's office indicated it would take the lead with Franciscan to get a HIPPA release, presumably narrowly tailored to Oliphant's inquiry, and that Rose need not take further action. Dr. Young's office called Oliphant back at 4:08 p.m. on September 25, 2015 – the same day as Oliphant's call – and indicated it needed a HIPPA release. It never received a release from Franciscan. Critically, Rose would have executed a HIPPA release if she had been asked to do so. The undisputed evidence is that no one approached Rose and asked her to sign a HIPPA release.

Having heard nothing further and with the expectation that her doctor's office was communicating with Franciscan, Rose sent four emails, two to Oliphant and two to Ball between September 30, 2015 and October 12, 2015. In these emails, she implores Ball and Oliphant to let her know if there is anything more they need from her and requested a status update. As noted above, Oliphant did not respond or further discuss the work restriction or a HIPPA release with Rose. Ball admits to having a single conversation with Rose but that she did not seek clarification of the September 24, 2015 work restriction during this conversation. Instead, Rose was left to debate with Clark and Ball whether her Imaging Center position counted towards Dr. Young's work restriction that, on its face, related strictly to the Franciscan triage position.

      iii.     Defendant Failed to Take Important and Necessary Steps to Understand Rose's Work Restriction and, Thus, Caused the Critical Breakdown.

The inevitable first piece of the break down in the interactive process occurred when the hospital – subject to and well versed in HIPPA's privacy mandates – informally sought

19

information from Rose's doctor about the work restriction it had been provided.  Oliphant, and

Ball for that matter, knew that Dr. Young would require a HIPPA release to release Rose's

medical information.  Nevertheless, and without getting Rose's consent, Oliphant tried to get

clarification outside of HIPPA protocol.  Dr. Young told Oliphant it would speak with her once it

secured a HIPPA release within an hour of receiving her call on September 25, 2017.  Franciscan

never requested Rose sign a release.

Clark confirmed that no one in Human Resources reached out and asked for one, and Ball

confirms that Human Resources did not instruct her to get one.  Once Oliphant complied with

Rhodes request to contact Dr. Young's office, she was out of the loop, even failing to respond to

Rose's inquiries for an update.  Ball admits that she was neither asked to obtain one or to ask for

one directly from Rose.  To her credit, Ball expressed no surprise that Dr. Young's office would

not cooperate with Franciscan's clarification request without receiving a release first.

Nevertheless, having received Oliphant's email indicating, 'the doctor's office would not speak

to me about it' [Def's Exh. 35-13], Ball inexcusably did not inquire whether Oliphant had

obtained a HIPPA release from Rose or instructed her to get one.  Instead, Ball passed the ball to

Human Resources who likewise did not instruct Ball to get a HIPPA release from Rose.  Even

Human Resources did not reach out to Rose and indicate that a HIPPA release had to be

provided so they could make further inquiries in to Dr. Young's September 24th restriction.

Franciscan knows of the importance of HIPPA releases.[3]

Moreover, Franciscan never responded to Rose's electronic inquiries requesting a status

---

[3] Franciscan even refused to identify whether Mary Ann Whitney had a disability in response to an Interrogatory served on it.  [Pl Exh 5].

update or whether there was something more for her to do.  In short, they failed to do anything.

Clark, and later Ball, both spoke to Rose one time each.  Clark left a voice mail and an electronic

string ensues.  Nothing in that string suggests that Clark sought clarification regarding what the

work note meant, only Rose's status with the Imaging Center.  As for Clark's call, she only

testified that the purpose of her call was to seek clarification, but she did not otherwise recall the

details.  Rose's response revolves around her job at the Imaging Center and its disassociation

from St. Francis.

Ball likewise admits to a single conversation with Rose.  It was, in her words, 'to see if

the work restriction had been lifted."  She did not seek clarification from Rose about what the

work restriction presented meant.  That Defendant even argues that, 'Franciscan communicated

its understanding multiple times in multiple ways – both over the phone and in writing via email'

[Def's Brief, p. 20, lns. 20-21] distorts facts and is disingenuous.

But that is contradicted both by the note itself – which reported what Rose's supervisor

said it had to convey – and Rose herself.  Rose told Clark that her Imaging Center position was

not affected by the note.  The logical next step was for the hospital to seek Dr. Young's opinion,

and all it needed was a HIPPA release it was told to provide.  It failed in this endeavor, and,

unlike, Rose, there is nothing in the record reflecting more than a first casual, and inappropriate,

attempt by Franciscan to get this information from Dr. Young without a release.  For her part,

Rose relied upon Franciscan to follow her doctor's directive to provide a release and stayed in

touch by inquiring whether additional information was needed.  When Franciscan failed to

indicate that more was needed, there was no basis for Rose to conclude that more was required.

The next thing she learns is that she is denied the position because Franciscan has concluded the

21

note applies to both the Imaging Center and .8 FTE positions.

     iv.    Defendant's Failure Caused Rose's Harm

There is no question that if asked Dr. Young would have shared his opinion that his work restriction only related to the triage position for which Rose applied.  Dr. Young indicated his note could be construed as Rose being permitted to work 8 shifts in triage every two weeks, or, alternatively, 64 hours every pay period to meet the dynamic triage environment.  Moreover, he admitted that Franciscan's reading of his note was a mistaken assumption, one he ostensibly would have corrected if the hospital had taken the simple step of procuring a HIPPA release from Rose as his office requested it do.  If the hospital learns that opinion its basis for denying Rose the position dissipates and, as the only candidate, the position would have been Rose's as promised.[4]

    **C.**    **Defendant Discrimination Against Rose because of her Disability**

     i.    Legal Standard

Rose agrees with Defendant's recitation of the last as to what she is required to prove under Dickerson v. Bd. Of Tr. Of Cmty. Coll. Distr. No. 522, 657 F.3d 595, 601 (7th Cir. 2011).  Thus, she must establish that she is (1) disabled; (2) met performance expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated non-disabled individual was treated more favorably.  Having successfully met these four prongs, Franciscan is required to articulate a legitimate reason for denying Rose the .8 FTE position.  [Id].  Rose has the final burden of persuasion that the reason provided by Defendant is a lie.  [Id].  Rose easily meets

---

[4] Rose is aware that Defendant will argue that the 1.0 FTE status exemption policy maintained by Franciscan would still cause her to suffer no harm.  Rose addresses this claim in a later section of this brief.

these burdens.

    ii.    Rose is a Qualified Individual with a Disability

Initially, Plaintiff must show that she is disabled under the ADA because she has an impairment that substantially limits one or more of her major life activities. DePaoli v. Abbott Labs., 140 F.3d 668, 672 (7th Cir. 1998). Here, Franciscan concedes that Rose is disabled. The question, thus, turns to the issue of whether she is a qualified individual with a disability which is answered affirmatively.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires." 42 U.S.C.§12111(8). The determination of whether Plaintiff was a QUID must be made on the basis of her capabilities at the time of the employment decision. Duda v. Board of Educ. Of Franklin Park Pub. Sch. Distr. No. 84, 133 F.3d 1054, 1059 (7th Cir. 1998). Rose's doctor affirmed that she was capability of meeting the essential functions of the job as defined by Oliphant, Rose's supervisor. To wit, Oliphant indicated that Rose needed to be able to ambulate through triage and work 8 shifts (.8 FTE) every two weeks as required. Dr. Young, Rose's doctor, supplied a work restriction confirming that Rose could, in fact, perform the position.

Defendant's argument seems to turn on the issue of its misreading of the work note. However, as argued in the section explaining why Franciscan is at fault for the break down in the interactive process, it would have learned, if it had requested the proper release and followed HIPPA protocol, of Dr. Young's opinion. Dr. Young opined that Rose could work up to 8 shifts per week or 64 hours every two weeks in triage consistently. That defendant was mistaken as to

the doctor's meaning does not alter the fact she was qualified to perform the essential functions of the position.  In any event, if the Court is to evaluate Defendant's state of mind when making this determination at the time Rose applied for the .8 FTE position it should not overlook that it was the hospital, and not Rose, who prevented Franciscan from learning that her doctor had given her clearance to perform the .8 FTE Patient Access position in triage.

iii.    Rose Met Defendant's Performance Expectations.

To Franciscan's credit, it acknowledges in its brief that Rose had worked in triage and that she was a 'hard worker', a 'valued employee', with a 'very strong work ethic.'  As such, Defendant has not raised an issue of fact with Rose's performance or qualifications for the position other than the doctor's note discussed throughout herein.

iv.    Rose was denied the .8 FTE position

Defendant provided no caselaw that suggests that 'failure to hire' does not constitute an adverse employment action.  Rather, its only argument is that Rose cannot prove she suffered an adverse employment action because she cannot link it to her disability.  As a result, Defendant has waived this argument.

For the reasons set forth herein, Rose contends she has presented ample evidence of both an ADA discrimination claim and Defendant's bad faith in causing a breakdown in the interactive process.  Thus, Rose contends she has suffered an adverse employment action.

v.    The .8 FTE position was given to a non-disabled individual

Defendant contends that Rose cannot identify a similarly-situated in support of her ADA claim.  This contention is absurd.  The similarly-situated person to whom Rose would point is the individual who Defendant identified in response to Plaintiff's Interrogatory No. 11.  [Pl Ex. 5, p.

24

7].  And, while Defendant hid behind HIPPA to deny Rose the opportunity to learn of any

disability Mary Ann Whitney might suffer – a curious move given its own attempts to gain

medical information about Rose from her doctor without such a release – Rose can attest to the

fact that Whitney does not readily display or report any signs of suffering from a disability.  Rose

worked with Whitney.  At no time did Whitney disclose and disability to Rose, and Rose did not

observe any outward symptoms of any condition.  Given Rose's own physical ailments, it is

reasonable to infer that if Whitney had such a condition she would have confided in Rose.  She

did not because she is not disabled.

> vi.    Rose Demonstrates that Defendant's Various Explanations Create an Inference
> that Franciscan is Lying

Pretext may be shown "either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's

proffered explanation is unworthy of credence".  Texas Dept. of Community Affairs v. Burdine,

450 U.S. 248, 101 S. Ct. 1089, 1095 (1981).  One can reasonably infer pretext from an

employer's shifting or inconsistent explanations for the challenged employment decision.

Applebaum v. Milwaukee Metro. Sewage Dist., 340 F.3d 573, 579 (7th Cir. 2003); Lawson v.

CSX Transp. Inc., 245 F.3d 916, 931-32 & n. 13 (7th Cir. 2001).

In Walter v. United Farm Mutual Insurance Company a/k/a Farm Bureau, 2004 WL

1629549 (S.D.Ind. 2004), Farm Bureau had provided one explanation for its action to the EEOC

and presented a different explanation in its motion for summary judgment.  [Id. at 13].  In

reviewing the inconsistent reasons provided by Defendant, this Court denied Defendant's motion

for summary judgment.

Here, Defendant's reason for misinterpreting Rose's doctor's work restriction is in flux.

First, Jones reports to the EEOC that Dr. Young's office indicated the restriction applied to both position.  By email, Oliphant simply reported that Dr. Young's office provided no information.  And one or the other or both of these explanations is equally incongruent to the explanation provided by Defendant in its answer to Plaintiff's Interrogatory No. 19.  [Pl Exh 5, p. 12].  Moreover, Oliphant claimed she played no part in preparing these answers, and her October 8, 2015 email to Carrie Ball directly refutes the answer provided to Rose's discovery.  These shifting explanations cannot be squared.

Nevertheless, Franciscan tries to erase Jones' representation to the EEOC.  This Court should reject Jones' conclusory assertion that it was an 'honest mistake' to report to the EEOC that Dr. Young's office reported that the work restriction applied to both the Imaging Center position and the .8 FTE position.  In <u>Berry v. Chicago Transit Auth.</u>, 618 F.3d 688 (7th Cir. 2010), the Seventh Circuit Court of Appeals distinguished between uncorroborated, self-servicing testimony based on personal knowledge or firsthand experience which may prevent summary judgment as evidence of disputed material facts and mere conclusory allegations that do not constitute evidence.  Here, while Jones would have knowledge of what she submitted to the EEOC, she has provided no context to the Court to explain how she made an honest mistake.  She has not because she cannot.

Oliphant testified that she spoke with Dr. Young's office, and Defendant affirmed that only Oliphant spoke with Rose's doctor's staff.  Oliphant testified that no one spoke to her to assist in the preparation of the position statement.  Oliphant also testified that the representation in the position statement was untrue.  So, Jones cannot rely on some mistaken understanding of what Oliphant might have related to her.

26

Oliphant reported to Ball by email dated October 8, 2015 only that Dr. Young's office would not speak with her.  If the source of Jones' information is Ball, then all Ball knew was what Oliphant did not get clarification from Dr. Young.  So, it seems equally unlikely that Jones would have gotten her misinformation from Ball unless Ball lied to Jones.  At the end of the day, however, Jones simply asks this Court to disregard her mistake as a break down in communication.  But given that no employee who learned what Dr. Young's office told Oliphant agrees with Jones' rendition of events, it is hard to fathom that 'the doctor wouldn't speak to us' could morph in to 'the doctor's office confirmed that its work restriction applied to all of Rose's positions evenly."  Given that all inferences must be drawn in Rose's favor and the conclusory nature of Jones' depiction of the erroneous representation in Franciscan's position statement without much transparency, her testimony should be stricken or Rose should be permitted to utilize her statement to show pretext.

And, unfortunately for Franciscan, that is not all the evidence of pretext that Rose has in her arsenal.  In Jones' and Rhodes' affidavits, they note that Rose would have been ineligible for the .8FTE Patient Access position in any event because Human Resources does not permit any employee to hold more than a 1.0 FTE status.[5]  Rose was never told this, and there is no evidence that any discussion with a Franciscan employee led to Rose being denied a position for this reason.  So, Defendant's efforts to claim it has an 'ace in the hole' legitimate basis to deny the position to Rose serves, if anything, to create more evidence of shifting defenses.

Of a lesser but important nature, there are also Defendant's claims that it attempted on

---

[5] As a reminder, Franciscan has consistently tried to lump in Rose's Imaging Center position with that of the .8 FTE Patient Access position.

multiple occasions to seek clarification from Rose regarding her worker's note.  But that is simply not true.  Rose reached out to Franciscan multiple times asking if there was anything more that was needed.  Both Clark and Ball testified that they did not or did not recall asking Rose about the particulars of the September 24, 2015 work restriction.  Nevertheless, Defendant cites facts in support of this proposition and rely upon them in their brief as to Defendant's 'honest' believe in its interpretation of Rose's restrictions.  The totality of this evidence, and the reasonable inferences drawn therefrom, support a finding that Rose has established pretext for purposes of surviving summary judgment.

      vii.    Defendant's 1.0 FTE Employment Limitation Should be Disregarded by The Court

As Defendant noted, Rose filed her first charge of Discrimination in September 2015.  It was not until September 25, by affidavit, that Defendant raised any issue of maximum employment status of 1.0 FTE as an independent basis to justify denying Rose the .8 FTE position in triage.  A chronology of this case is helpful in understanding Rose's issue with this development:

1)    It is undisputed that in September and October 2015, no one ever tells Rose that she cannot work both positions because of a 1.0 status restriction imposed by Franciscan.

2)    In January 2016, Jones submits a position statement to the EEOC on behalf of Franciscan.  There is no mention of this limitation in said statement.  [Def.'s Exh 35-23].

3)    Jones is not identified as a witness in any disclosure to Rose.  Rhodes is identified as a witness, but conclusions about her anticipated testimony are reasonably

28

connected to her affirmation of Defendant's discovery responses.

4)     On July 25, 2017 – 2 months before the discovery deadline – Jones and Rhodes

contribute to Defendant's preparation of its answers to Plaintiff's Interrogatories.

5)     The answers *only* identify the doctor's note and the restriction as the basis for

Rose being denied the .8 FTE position.  Importantly, Rhodes affirms the answers.

[Pl Ex. 5].

6)     On September 25, 2017, discovery closed.

7)     On September 25, 2017, Rhodes signed her affidavit.

8)     On November 6, Jones signed her affidavit.

In essence, Defendant has now postured a new explanation for Rose's denial at the earliest on the

day discovery closed, denying Rose any opportunity to test the existence of such a policy and

whether there is anyone who enjoys more than a 1.0 FTE status with Franciscan and/or entities it

has an ownership interest in.

    This Court should reject this factual assertion as a sanction for Franciscan's failure to

timely disclose this independent basis to deny Rose the position.  In <u>Securities and Exchange</u>

<u>Commission v. Matthew Roszk et. al.</u>, 495 F.Supp.2d 875 (N.D.Ill. 2007), the Court, faced with

similar circumstances, did just that.  The Court found that a failure to disclose witnesses and

provide underlying documents to the SEC that were used to create exhibits was sufficient to

exclude this information from evidence.  [Id. at 885.]

    Under Fed Rule of Civil Procedure 37, a party who fails to disclose evidence pursuant to

Rule 26 without substantial justification is not permitted to use this evidence unless the failure to

disclose was harmless.  [Id.] (citing Fed. R. Civ. P. 37(c)(1).  The sanction of exclusion is

mandatory unless the party can show that its violation of Rule 26 was either justified or harmless.  Westefer v. Snyder, 422 F.3d 570, 584 n. 21 (7th Cir. 2005).  The Court has discretion to determine if the failure is harmless.  David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003)

First, as noted above, this new reason just casts another lure in to the pond of potential reasons for denying Rose the position.  Moreover, the manner in which this evidence suddenly appears casts substantial doubt on every explanation Franciscan has provided the Court to substantiate its reason for denying Rose the .8 FTE position.  Still, Defendant must be denied the use of this evidence as it now seeks the 1.0 FTE status limitation to defeat Rose's case in chief.  Given these facts, the Court should sanction Defendant by excluding this evidence at summary judgment and after.

Finally, it appears that Defendant may have also attempted in their brief to raise the mixed motive affirmative defense.  Mixed motive is an affirmative defense.  Speedy v. Rexnord Corp., 243 F.3d 397, 401 (7th Cir. 2001).  The failure to plead an affirmative defense in the answers works a forfeiture only if the Plaintiff is harmed by the defendant's delay in asserting it.  Id. (citation and internal quotation marks omitted).  A cursory review of Defendant's answer and brief presupposes that, if Defendant has raised this defense, it does so now in its summary judgment brief.  This leaves Plaintiff will not opportunity to conduct any discovery to challenge the veracity of this recently introduced explanation.  This Court denied Rolls Royce the ability to plead the affirmative defense of statute of limitations for the first time in its reply brief.  Petroleum Helicopters, Inc. v. Rolls Royce Corp., 2017 WL 167722 (S.D.Ind. 2017).  The same result should be reached in this case, and Franciscan should not only be denied the use of this

30

evidence but also denied the ability to argue mixed motive at summary judgment or hereafter.

## V.      Conclusion

As demonstrated throughout, Rose has presented facts depicting her efforts to engage in the interactive process in good faith.  It is Franciscan's failures that led to Rose being denied the .8 FTE position.  Additionally, Rose has presented evidence as to each of the elements under the indirect method to satisfy the requirements of an ADA discrimination claim.  Therefore, Rose reiterates her request that this Court deny Defendant's motion.

Respectfully submitted,

s/ Christopher S. Wolcott
Christopher S. Wolcott (#23259-32)
The Wolcott Law Firm LLC
Of Counsel, Gibbons Legal Group P.C.
450 East 96th Street, Suite 500
Indianapolis, Indiana 46240
Telephone:     (317) 500-0700
Facsimile:     (317) 732-1196
E-Mail:   indy2buck@hotmal.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this 15th day of December, 2017, by email, and properly addressed to the following counsel of record for Defendant by operation of the Court's Electronic Filing System:

Dana Eugene Stutzman
HALL, RENDER, KILLIAN, HEATH & LYMAN, PC
dstutman@hallrender.com

Nicholas Scott Johnston
HALL, RENDER, KILLIAN, HEATH & LYMAN, PC
njohnston@hallrender.com

31

/s/  Christopher S. Wolcott