**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MARY ROSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 1:16-cv-03212-TWP-MJD |
| | ) |
| FRANCISCAN ALLIANCE INC., | ) |
| | ) |
| Defendant. | ) |

<u>**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Franciscan Alliance, Inc. ("Franciscan") ([Filing No. 35](#)).  Franciscan is a network of hospitals and health care providers, serving patients in Indiana and Illinois.  Plaintiff Mary Rose ("Rose") is an employee of Franciscan, who was denied a new position at one of Franciscan's hospitals in central Indiana.  After Rose was not offered the new position, and she initiated this lawsuit asserting a claim for disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA").  Franciscan filed a Motion for Summary Judgment, asserting that Rose was not a qualified individual, and there is no evidence of discrimination on the basis of disability.  For the following reasons, the Court **grants** Franciscan's Motion for Summary Judgment.

## I.     <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Rose as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In May 2011, Rose started a position at St. Francis Hospital (the "Hospital"), one of Franciscan's network hospitals, as a part-time registrar in Patient Access with a .2 FTE schedule[1], which required Rose to work two days every two weeks. Being a registrar involved obtaining demographic and insurance information from patients as well as handling other payment matters (Filing No. 1 at 2; Filing No. 35-3 at 1). The work was primarily sedentary but did require some movement and lifting up to 25 pounds. Rose met Franciscan's performance expectations and did not receive any discipline in the performance of her duties (Filing No. 1 at 2; Filing No. 35-4 at 3).

Rose has cerebral palsy and a vision impairment (Filing No. 35-1 at 6). When she was hired, Franciscan was aware of Rose's disability. *Id.* at 7–8. During her employment in the registrar position, Franciscan considered Rose to be a hard worker and a valued employee with a very strong work ethic (Filing No. 35-3 at 1).

In September 2014, Rose accepted a position at St. Francis' Greenwood Imaging Center (the "Imaging Center") with a .5 FTE schedule (Filing No. 35-2 at 1). The Imaging Center is owned in part by Franciscan and is operated as an outpatient department of the Hospital (*Id.*; Filing No. 35-3 at 1–2). Accepting this new position required Rose to change her .2 FTE registrar position with the Hospital to PRN[2] status, meaning she no longer worked regularly scheduled hours and only worked if called in to do so (Filing No. 35-2 at 1; Filing No. 35-5).

In May 2015, Rose obtained a note from her physician, Kenneth Young ("Dr. Young"), indicating Rose required some work restrictions. Dr. Young directed Rose to limit her walking

---

[1] FTE stands for "full-time equivalent". A schedule of 1.0 FTE is equivalent to a typical full-time shift of 40 hours per week, .2 FTE is equivalent to two days every two weeks, and .5 FTE is equivalent to part-time work of 20 hours per week and .8 FTE is equivalent to 8 days on a consistent basis very two weeks. (Filing No. 35-2).

[2] "PRN" is a Latin term that refers to the phrase, "as needed." http://work.chron.com/prn-employee-1489.html

and standing, elevate her legs as much as possible, and wear support hose (Filing No. 35-6).  Dr. Young noted that Rose would be re-examined in three months.  *Id.*  Rose brought this note to Franciscan, and in response, Franciscan moved her to a new position in the Hospital's triage department, but her registrar title and PRN status did not change (Filing No. 35-2 at 1–2).  The triage position reduced the amount of walking and standing Rose would have to do while on the job and allowed her to elevate her legs.  *Id.*  Rose did not want to be removed from her registrar position (Filing No. 35-22 at 1).

In August 2015, Dr. Young issued another work restriction note, indicating the same limitations were in place for Rose and that the limitations should be extended for another three months (Filing No. 35-8).

In September 2015, a .8 FTE Patient Access position became available at the Hospital. The position was a "set schedule" position. Rose applied for this position while still working in the .5 FTE position in the Imaging Center. The responsibilities of this .8 FTE position were the same duties Rose performed in her Patient Access registrar position, only this new position required more hours (Filing No. 35-3 at 2–3; Filing No. 42-6 at 1).  Rose asked her supervisor, Sarah Oliphant ("Oliphant"), whether she needed to "reapply" for the position, and Oliphant responded that she did not need to, but she would need to provide a doctor's note.  Rose asked what the doctor's note needed to say, to which Oliphant responded, "The note needs to state you are able to ambulate the distance to triage, that you are able to work the 8 days on a consistent basis."  (Filing No. 35-9 at 1.)  Rose obtained a note from Dr. Young, which read, "Patient is able to walk the distance to triage & may work 8 days on a consistent basis every 2 weeks."  *Id.* at 2.  Working eight days on a consistent basis every two weeks equated to a .8 FTE position.  On September 24,

2015, Dr. Young's office faxed the note to Rose at the Imaging Center, and Rose took the note to Oliphant the following day (*Id.*; Filing No. 42-6 at 1).

On September 25, 2015, Oliphant contacted Dr. Young's office at the request of Franciscan's Director of Patient Access, Sharla Rhodes ("Rhodes"). They needed clarification regarding the work restriction described in Dr. Young's note (Filing No. 35-2 at 2; Filing No. 35-13). Franciscan asserts that they were confused about the applicability of the eight-day work restriction and whether it applied only to Rose's potential position in Patient Access or whether it applied to all of Rose's positions, including her position in the Imaging Center (Filing No. 35-2 at 2).[3] Without Rose's knowledge, Oliphant contacted Dr. Young's office to seek clarification about Rose's work restriction (Filing No. 42-6 at 1).

When Oliphant called Dr. Young's office to obtain clarification she was not provided with any information about the restriction (Filing No. 35-11 at 15; Filing No. 35-2 at 2). Dr. Young's staff called Rose to explain that they had received a telephone call from Oliphant about the work restriction. Rose was unhappy that Oliphant had called Dr. Young's office without asking her first. (Filing No. 42-6 at 1–2.) She insisted that Dr. Young's office protect her HIPAA rights before releasing any information. Before any information was released, Rose wanted to know what medical information was being sought and wanted a HIPAA release on file. However, Rose did not instruct "anyone at Dr. Young's office to refuse to cooperate with St. Francis." *Id.* at 2.

---

[3] At that point in time, Rose held her position in the Imaging Center as a .5 FTE employee. The Patient Access position was a .8 FTE position, and thus, if Rose was hired for the new position while still working in the Imaging Center, she would have been working at a combined 1.3 FTE status. If Dr. Young's work restriction limited Rose to eight shifts every two weeks (the equivalent of .8 FTE) in all her positions, then she would have been limited to working less than the 1.3 FTE status of the two positions. Therefore, according to Franciscan, clarification was needed regarding Dr. Young's work restriction.

Dr. Young's staff never instructed Rose to come to their office to sign a HIPAA release. Rather, they told Rose that they would take care of it and ask St. Francis for a release. Rose also was not asked by anyone at St. Francis to sign a HIPAA release. *Id.*

Dr. Young's medical record of the telephone call with Rose indicates,

> [Rose] stated she is going to work at St. Francis emergency room 8 days every two weeks . . . and at Greenwood Imaging . . . . She said she has to work these hours. She doesn't want us to tell them anything. I told her we can't because we have to have her written permission to do that.

(Filing No. 35-12 at 16). Dr. Young and his staff testified that Rose directed them not to release any information to Franciscan (Filing No. 35-19 at 11–13; Filing No. 35-12 at 16; Filing No. 35-17 at 5).

After the telephone call with Rose, Dr. Young's staff called Oliphant and explained, "We cannot discuss anything on behalf of [Rose] with [you] unless [Rose] releases in writing that we can talk to [you]." (Filing No. 35-12 at 4.) Neither Franciscan nor Rose provided a HIPAA release to Dr. Young's office (Filing No. 42-9 at 7). Franciscan never received clarification about the eight-day work restriction from Rose or Dr. Young's office (Filing No. 35-2 at 3; Filing No. 35-11 at 15).

In the following weeks, Rose made several attempts to follow up on the status of the open position. On September 30, 2015, she emailed Oliphant to ask if there was "any word" on the position (Filing No. 42-1). On October 2, 2015, she emailed Oliphant to ask if she needed to reapply. Oliphant responded that she did not need to reapply. Rose replied, asking if Oliphant had everything she needed from her and Dr. Young's office (Filing No. 42-2). On October 7, 2015, Rose emailed Carrie Ball ("Ball"), Franciscan's Manager of Patient Access, and copied Oliphant on the email. She noted that she had applied for the position, asked for a timetable of

when a decision would be made, and asserted, "I did provide all statements from my Dr that sarah has requested  ??" [sic] ([Filing No. 42-3](#)).

On October 8, 2015, Oliphant sent a response email only to Ball and explained that Dr. Young's office would not provide clarification about the work restriction and that Rose was not planning to leave her position at the Imaging Center, which would result in her working more than .8 FTE.  Oliphant asked Ball if they needed to talk with Human Resources, and Ball asked Oliphant to contact Human Resources to get guidance on the situation ([Filing No. 35-13](#)).  On October 12, 2015, Rose sent another follow-up email to Ball ([Filing No. 42-4](#)).

Human Resources informed Ball and Rhodes that they needed to comply with Dr. Young's restrictions for Rose in relation to all of Rose's positions, not just the .8 FTE position for which Rose applied ([Filing No. 35-2 at 3](#); [Filing No. 35-10 at 6](#)).  On October 15, 2015, Cindy Erickson in Human Resources informed Ball that someone in Human Resources was going to contact Rose to "discuss the information provided to us by her physician and the need to work within those guidelines."  ([Filing No. 35-14 at 3](#).)

On October 19, 2015, Sherri Clark ("Clark"), a human resources generalist, called Rose and left a voicemail message for her ([Filing No. 35-15 at 1](#)–2).  On October 20, 2015, Rose and Clark connected, and Rose explained that she intended to continue working in the Imaging Center and asserted that it was "a separate HR."  *Id.* at 1.  Clark responded that the Imaging Center and the Hospital were under the same Franciscan umbrella, so any combined employment would have to be .8 FTE.  After Rose further explained the separate HRs and separate accrual of benefits on October 21, 2015, Clark reiterated that both the Imaging Center and the Hospital were under the same Franciscan umbrella, and she was limited to .8 FTE under all positions pursuant to her doctor's order.  *Id.*

On October 22, 2015, Ball spoke with Rose and explained that the Hospital could not work her more than a .3 FTE position based on her doctor's restriction because of her other .5 FTE position in the Imaging Center. Ball further informed Rose that she could not be given the .8 FTE position, but she would be kept on in her PRN status. She also told Rose that the Hospital could work her more hours if the doctor's restrictions were lifted ([Filing No. 35-18](#)). Additionally, Ball told Rose that one of her options to be eligible for the .8 FTE position was to resign from her .5 FTE position in the Imaging Center ([Filing No. 35-20](#); [Filing No. 35-10 at 30](#)–31). Because Rose did not want to resign from her .5 FTE position in the Imaging Center, Franciscan did not offer the .8 FTE Patient Access position to Rose ([Filing No. 35-2 at 3](#)–4).

Dr. Young issued another note continuing Rose's same work restrictions in February 2016 ([Filing No. 35-21](#)). The last shift that Rose worked at the Hospital was on May 29, 2016, and she has not requested a PRN shift since her May 29, 2016 shift ([Filing No. 35-1 at 43](#), 46). Rose is still employed in the Imaging Center. *Id.* at 9.

On September 18, 2015, Rose filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Franciscan discriminated against her on the basis of her disability from May 2015 through September 2015. Rose alleged that the disability discrimination occurred after she provided a doctor's note in May 2015, which limited her walking and standing, and Franciscan unilaterally moved her from the Patient Access registrar position to the triage position and changed her status to PRN ([Filing No. 35-22 at 1](#)–2). On December 9, 2015, she amended her EEOC charge of discrimination, adding the allegation that Franciscan discriminated against her on the basis of her disability when it denied her the .8 FTE position in October 2015. *Id.* at 3–4.

On November 25, 2016, Rose filed this lawsuit, asserting a claim against Franciscan for disability discrimination under the ADA (Filing No. 1). After answering the Complaint, Franciscan filed its Motion for Summary Judgment, arguing that Rose was not a qualified individual and there is no evidence of discrimination on the basis of disability (Filing No. 35).

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Rose, as the non-moving party and draws all reasonable inferences in her favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

## III.    DISCUSSION

Franciscan argues that it is entitled to summary judgment on Rose's ADA claim because Rose was not a "qualified individual" with a disability to be able to support her claim, Rose caused a breakdown in the interactive process, there is no evidence to support the elements of a disability discrimination claim, and Franciscan had a legitimate non-discriminatory reason for not offering Rose the .8 FTE position. Franciscan also asserts that some of the facts and evidence that Rose offers fall outside the scope of the EEOC charge and thus cannot be considered by the Court. Rose argues that the evidence supports her ADA claim, and she asserts that some of Franciscan's evidence should not be considered because it is inadmissible. The Court will address the parties' arguments in turn.

A.    **Admissibility of Franciscan's Evidence**

In her Response Brief, Rose asks the Court to disregard some of the evidence from her

medical record that has been designated by Franciscan.  She asserts,

> Franciscan points to statements attributed to Rose in notes made by Reggie Wessic
> in the medical records obtained from Dr. Young's office. These notes, taken by
> Wessic, report what Rose allegedly said. This constitutes inadmissible hearsay
> evidence. Hearsay is a statement, other than one made by the declarant while
> testifying at the trial or hearing, offered in evidence to prove the truth of the matter
> asserted. Fed. R. Evid. 801(c). Rose disavows ever instructing Wessic or anyone at
> Dr. Young's office to not provide information to Franciscan; rather, Rose was
> unhappy that Franciscan did not approach her to request a HIP[A]A release before
> contacting Dr. Young and asked that her doctor comply with HIP[A]A
> requirements. As Defendant cannot point to any of the exceptions spelled out in
> Fed. R. Evid. 801(d)(2) that apply here, the statement is hearsay and cannot be used
> to prove that Rose obstructed with Dr. Young's office cooperating.

(Filing No. 42 at 17–18).

Franciscan responds that Rose ironically relies on her medical records when they support

her position but then asserts that the records are inadmissible hearsay when she believes the records

do not support her position.  Franciscan argues that the medical records, and specifically the

statement Rose seeks to exclude, are not hearsay.

Franciscan asserts that the statements in the Rose's medical records are not hearsay.  They

explain that the instruction from Rose to Dr. Young's staff to not provide information to Franciscan

was simply an instruction that carries no hearsay implications because "[i]nstructions to an

individual to do something are . . . not hearsay."  *United States SEC v. Berrettini*, 2015 U.S. Dist.

LEXIS 115963, at *33 (N.D. Ill. Sep. 1, 2015).  Franciscan argues that Rose's statement is not

hearsay under Federal Rule of Evidence 801(d)(2)(A) because it is a statement of a party opponent.

*See Mitchell v. Iowa Interstate RR, Ltd.*, 2010 U.S. Dist. LEXIS 51474, at *4 (C.D. Ill. May 25,

2010) ("To the extent that the records contain a reporting of what Plaintiff told his treating

physicians, they may also constitute admissions of party opponent, thereby falling out of the

definition of hearsay altogether.").  Franciscan also asserts exceptions to the hearsay rule that allow the Court to consider the evidence challenged by Rose—present sense impression (Rule 803(1)), statement made for medical diagnosis or treatment (Rule 803(4)), records of regularly conducted activity (Rule 803(6)), and the residual catch-all exception (Rule 807).

Rose seeks to exclude from the Court's consideration the statement documented in her medical record that "[Rose] stated she . . . doesn't want us to tell them anything."  (Filing No. 35-12 at 16.)  This statement falls squarely within Rule 801(d)(2)(A) as a statement that is not hearsay because it is from a party opponent and offered against that opposing party.  Therefore, the Court is permitted to consider the statement and the medical record when determining the issues raised in the summary judgment motion.

Rose also seeks to exclude from the Court's consideration Franciscan's assertion that it has an employment policy of not hiring its employees above the 1.0 FTE status.  This assertion is used by Franciscan to argue that Rose still would not have been offered the .8 FTE position even if she was not barred from the position by her own doctor's work restrictions.  This assertion is supported by affidavits from Rhodes and Pamela Jones ("Jones"), general counsel to Franciscan (Filing No. 35-2; Filing No. 35-3).

Rose argues that the Court should disregard this assertion because Franciscan never disclosed it during discovery and never previously relied on it as a basis to deny her the .8 FTE position.  Franciscan never raised the assertion as a defense with the EEOC.  Because the assertion was raised after the close of discovery, and the affidavits from Rhodes and Jones came after discovery, Rose asserts that she is unfairly prejudiced by the untimely, new assertion from Franciscan.  Similarly, she argues that Franciscan appears to raise a mixed motive defense in its

summary judgment brief, and Franciscan failed to raise the affirmative defense in its Answer, and thus, it has forfeited its opportunity to raise such a defense at this stage of the litigation.

Franciscan responds that it is not using its employment policy of a 1.0 FTE "ceiling" as an independent basis for denying Rose the .8 FTE position. Rather, it is used to show the Imaging Center falls under Franciscan's umbrella for business and policy purposes as well as to provide additional background information on why Franciscan was trying to get clarification from Dr. Young's office. Thus, Franciscan argues, it was harmless that the 1.0 FTE policy was not raised earlier. Concerning the discovery issue, Franciscan also points out that Rose chose not to depose Rhodes during discovery. Franciscan does not respond to the merits of Rose's mixed motive argument but simply notes that it asserted the mixed motive affirmative defense as an "alternative argument" and "out of an abundance of caution."

Based on the Court's determination of the other issues raised in the summary judgment motion as discussed below, the Court finds it unnecessary to address and resolve the merits of the belated mixed motive affirmative defense and the belated assertion that Franciscan has an employment policy of not hiring its employees above the 1.0 FTE status. However, the Court notes that it is not taking into consideration Franciscan's belated assertions in determining the propriety of summary judgment.

**B.    ADA Statute of Limitations and Exhaustion of Administrative Remedies**

Franciscan asks the Court to strike, or alternatively, to not consider any facts or allegations presented by Rose that are time barred by the ADA statute of limitations or that are barred as a result of Rose's failure to exhaust administrative remedies with the EEOC. Before filing a lawsuit under the ADA, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the discriminatory employment action. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1);

*Miller v. UPS*, 2008 U.S. Dist. LEXIS 3753, at *7–8 (S.D. Ind. Jan. 15, 2008). Failure to first present the discrimination claim to the EEOC bars the claim from court. Plaintiffs may bring claims for discriminatory conduct that occurred during the 300-day window stretching back from the date the EEOC charge was filed, and thus, conduct falling outside this 300-day window is not actionable. *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002).

Rose filed her initial charge of discrimination with the EEOC on September 18, 2015, and her amended charge on December 9, 2015. Thus, Franciscan asserts, any alleged discriminatory conduct that occurred before November 22, 2014, is time barred. Franciscan argues that Rose's EEOC allegation that she was involuntarily converted from a .2 FTE registrar to a PRN registrar in September 2014 when she started her second position in the Imaging Center is time barred.

Similarly, Franciscan argues that the Court should disregard any allegedly discriminatory conduct that occurred after December 9, 2015, the date of Rose's amended EEOC charge of discrimination. A condition precedent to filing suit for a discriminatory act under the ADA is that the plaintiff file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory act and that the EEOC issue a right-to-sue letter. *Miller*, 2008 U.S. Dist. LEXIS 3753, at *7–8; *Conner v. Illinois Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005). Any claims asserted in court must be within the scope of the charges filed with the EEOC. "[A]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Conner*, 413 F.3d at 680.

Franciscan argues that the Court should not consider Rose's allegations in her interrogatory response—that she believes she was discriminated against because she was denied work shifts through June 2016 and denied a job position in February 2016—because these allegations of purported discriminatory conduct were not (and could not have been) presented to the EEOC in

Rose's December 2015 charge. Allegations that Rose was denied shifts through June 2016 and a job position in February 2016 were not presented to the EEOC, and thus, Rose has failed to exhaust administrative remedies for these discrete actions.

Rose did not respond to Franciscan's arguments concerning the ADA statute of limitations and exhaustion of administrative remedies. Franciscan's arguments are well-taken and supported by case law and the evidence. Accordingly, the Court limits its consideration of Rose's ADA claim to those instances of alleged discrimination that occurred between November 22, 2014, and December 9, 2015.

**C.    Rose's ADA Claim**

Franciscan argues that summary judgment is appropriate because Rose was not a "qualified individual" with a disability, and she caused a breakdown in the interactive process. Franciscan further argues that there is no evidence to support the elements of a disability discrimination claim, and Franciscan had a legitimate non-discriminatory reason for not offering Rose the .8 FTE position.

**1.    Qualified Individual and the Interactive Process**

Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Seventh Circuit has recently explained the scope of the ADA:

> The Act forbids discrimination against a "qualified individual on the basis of disability." [42 U.S.C.] § 12112(a). A "qualified individual" with a disability is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8). So defined, the term "reasonable accommodation" is expressly limited to those measures that will enable the employee to work.

*Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017).

To support her claim for disability discrimination, Rose must show, "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) her employer took an adverse job action against her because of her disability or without making a reasonable accommodation for it." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). Franciscan acknowledges that Rose satisfies the first element—she is disabled. However, Franciscan argues, Rose cannot meet the second and third elements of her ADA claim.

Franciscan argues, "Rose is unable to carry her burden of establishing that she was a qualified individual who could perform the essential functions of the 0.8 FTE Patient Access Representative job that she applied for in August/September 2015 either with or without a reasonable accommodation." (Filing No. 36 at 20.) That job position required Rose to work .8 FTE, Franciscan believed her doctor limited her to working .8 FTE, and she already was working a .5 FTE position in the Imaging Center. Thus, Franciscan argues, Rose was not a "qualified individual" for the position because she could only work an additional .3 FTE status rather than the full .8 FTE status required by the position.

Franciscan then asserts, "As in many ADA cases, liability thus turns on the accommodation question: Did [Franciscan] violate the ADA by failing to reasonably accommodate [Rose's] disability?" *Severson*, 872 F.3d at 480. "Identifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process. Both parties are responsible for that process." *Brown v. Milwaukee Bd. Of School Directors*, 855 F.3d 818, 821 (7th Cir. 2017) (citations omitted).

If a reasonable accommodation was available but the employer prevented its identification by failing to engage in the interactive process, that failure is actionable. On the other hand, if the employee does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee.

*Id.* (citations and quotation marks omitted).

Franciscan argues that Rose is guilty of not only failing to provide information to determine an accommodation but also of actively obstructing Franciscan's ability to obtain such information. Franciscan explains that Rose not only failed to provide information to clarify whether Dr. Young's work restriction to .8 FTE status applied to all of Rose's positions, but she also affirmatively directed Dr. Young's office to not provide this clarifying information to Franciscan. Franciscan asserts that Rose was responsible for the breakdown in the good faith interactive process, and thus, it cannot be held liable for Rose's ADA claim.

Furthermore, Franciscan explains, it communicated to Rose multiple times through Ball and Clark its understanding that Dr. Young's work restriction of .8 FTE applied to all positions, including the Imaging Center position. Rose never tried to correct Franciscan's understanding of Dr. Young's work restriction. Rather than providing clarifying information that Dr. Young's restriction applied only to the position for which she applied, Rose contended with Franciscan that her Imaging Center position fell under a different human resources department and was a separate entity. Again, Franciscan asserts, Rose caused a breakdown in the interactive process.

Rose responds that she was a "qualified individual" for the .8 FTE position because her supervisor, Oliphant, explained the position required an ability to ambulate through the triage department and to work eight shifts every two weeks. Dr. Young's note explained that she could fulfill these two requirements. Thus, Rose asserts, she is a qualified individual. She argues that Franciscan misread Dr. Young's work restriction note, and "[t]hat defendant was mistaken as to

the doctor's meaning does not alter the fact she was qualified to perform the essential functions of the position."  ([Filing No. 42 at 23](#)–24.)

Rose further responds that Franciscan did not engage in the interactive process in good faith.  When Rose asked what the doctor's note would need to say for her to apply for the new position, Oliphant responded in an email, and Dr. Young's work restriction note nearly mirrored the language in Oliphant's email.  Rose then explains that Franciscan ignored HIPAA laws and tried to informally obtain more information from Dr. Young's office knowing that such an attempt would be unfruitful because of HIPAA laws.   After being denied the clarifying information, Franciscan never sought a HIPAA release from Rose to obtain information from Dr. Young.  Based on representations by Dr. Young's staff, Rose believed that the doctor's office would take care of any HIPAA release.  Rose additionally asserts that she did not think she could personally obtain the clarifying information and then provide it to Franciscan.  And Franciscan never asked Rose to clarify the work restriction.

Pointing to her medical records, Rose additionally argues that Dr. Young's office informed Franciscan that it would provide the clarifying information that Franciscan sought if it provided a HIPAA release ([Filing No. 35-12 at 4](#)).  But Franciscan never provided a HIPAA release.

Rose also asserts that she sent follow-up emails to Franciscan to check on the status of the job position, and she asked if Franciscan had everything it needed from Rose and Dr. Young's office ([Filing No. 42-1](#); [Filing No. 42-2](#)).  She did not get a response to the question of whether Franciscan had everything it needed from her and Dr. Young's office.  Then, five days later, Rose emailed to ask for a timetable of when a decision would be made and to explain that she had provided all the requested statements from her doctor ([Filing No. 42-3](#)).  This led Rose to an email and telephone call "debate with Clark and Ball whether her Imaging Center position counted

towards Dr. Young's work restriction." (Filing No. 42 at 19; *see also* Filing No. 35-15; Filing No. 35-18; Filing No. 35-20.)

Rose denies ever instructing anyone at Dr. Young's office to "refuse to cooperate" with Franciscan. When Dr. Young's staff called Rose to explain that they had received a telephone call from Oliphant about the work restriction, Rose was unhappy that Oliphant had not first asked her for permission to call her doctor. She admits that she insisted that Dr. Young's office protect her HIPAA rights before releasing any information. Rose contends that the breakdown in the interactive process was caused by Franciscan, and Franciscan should have done more to obtain a HIPAA release and to obtain clarifying information if it really needed clarification. She argues that she participated in the interactive process in good faith and was a qualified individual for the .8 FTE position.

Franciscan argues that the designated evidence shows it cannot be blamed for the breakdown in the interactive process in seeking to obtain clarifying information regarding Dr. Young's work restriction. Franciscan asserts, it fulfilled its obligation to participate in good faith in the interactive process as follows: First, Oliphant called Dr. Young's office on September 25, 2015, to seek clarification. Second, Clark called Rose about the work restriction and left a voicemail message on October 19, 2015. Third, Clark talked with Rose on the phone about the .8 FTE work restriction on October 20, 2015. Fourth, Clark communicated with Rose via email on October 20, 2015 about the Franciscan "umbrella" covering both positions and the .8 FTE restriction. Fifth, Clark communicated with Rose via email on October 21, 2015 about the Hospital and Imaging Center both falling under the Franciscan umbrella and her .8 FTE work restriction pursuant to her doctor's note. Sixth, Ball talked with Rose on the telephone on October 22, 2015 about her doctor's .8 FTE work restriction and her various options of continuing to work under a

PRN status, quitting the .5 FTE Imaging Center position to allow her to work the .8 FTE position, or having her work restrictions lifted by her doctor to allow her to work more hours.

Franciscan points out that each of these communications between it and Rose presented an ideal opportunity for Rose to provide the clarifying information about Dr. Young's work restriction, yet Rose never provided that information to Franciscan, and she did not authorize Dr. Young's office to provide the information. She could have easily explained that Dr. Young's .8 FTE work restriction applied only to the position for which she applied and not also to the Imaging Center position. However, instead of simply giving that clarifying information, Rose argued with Franciscan's employees that the Imaging Center and Hospital were separate entities with separate human resources departments.

Franciscan argues that the cases Rose relies on actually support Franciscan's position. Rose relies on three cases for the proposition that an employer must make a reasonable effort to seek an explanation or clarification if it has questions about a medical diagnosis or accommodation request. *See Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014); *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 486 (7th Cir. 1997); *Bultemeyer v. Fort Wayne Comm. Sch.*, 100 F.3d 1281 (7th Cir. 1996). Franciscan agrees with this proposition and asserts that its many efforts satisfied the obligation to seek explanation or clarification.

Franciscan notes that where a plaintiff had access to the needed clarifying information, and the plaintiff did not provide that information, then the plaintiff is responsible for the breakdown in the interactive process and the employer cannot be held liable. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996) ("Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the

[interactive] process."); *see also Brown*, 855 F.3d at 821–26; *Steffes v. Stepan Co.*, 144 F.3d 1070, 1072–73 (7th Cir. 1998). Franciscan contends that Rose had the needed clarifying information but did not provide it, and thus, she was responsible for the breakdown in the interactive process. She was not a qualified individual and, therefore, her ADA claim must be dismissed.

The Court determines that Rose "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions. [Franciscan] accordingly cannot be held liable for failing to put her in a position it believed would exceed those restrictions." *Brown*, 855 F.3d at 826 (citation and quotation marks omitted).

Rose applied for a position that she wanted, and it was her missing medical information that was holding up the process to allow her to receive the new position. She had access to that information and the ability to authorize the release of that information, but she failed to communicate that information or authorize her doctor to communicate that information to Franciscan. During the interactive process, Franciscan informed Rose of various options as to how to obtain the position she sought or how to obtain more work hours, but she chose not to pursue those options. Instead, she consistently insisted that the Imaging Center and the Hospital were separate entities with separate Human Resources departments, while not simply explaining to Franciscan that Dr. Young's work restriction applied only to the job position she was seeking.

Wanting to work more hours, Rose informed Dr. Young's office that "she is going to work at St. Francis emergency room 8 days every two weeks . . . and at Greenwood Imaging . . . . She said she has to work these hours. She doesn't want us to tell them anything." (Filing No. 35-12 at 16.) Dr. Young and his staff testified that Rose directed them not to release any information to Franciscan (Filing No. 35-19 at 11–13; Filing No. 35-12 at 16; Filing No. 35-17 at 5). The

clarifying information that Franciscan sought in order to accommodate Rose's disability was not provided because of Rose's direction.

Understandably trying to downplay the impact of these words—"[s]he doesn't want us to tell them anything"—Rose construes her directions to Dr. Young's staff in various ways. She avers in her affidavit, "I never instructed anyone at Dr. Young's office to refuse to cooperate with St. Francis. Rather, I wanted to be sure that I knew what medical information was being sought and that a HIP[A]A release was on file." (Filing No. 42-6 at 2, ¶ 9.) Further, "I was unhappy . . . Sara had not gotten written permission from me to speak to my doctor about my medical condition. I insisted that my doctor protect my HIP[A]A rights before releasing information." (Filing No. 42-6 2, ¶8.) Additionally, "I told her that I did not want her to speak to anyone at St. Francis without first getting a HIP[A]A release." (Filing No. 42-6 at 2, ¶11.) However one construes Rose's directions to Dr. Young's staff, the designated evidence (including Rose's own affidavit) is clear that the clarifying information about Dr. Young's work restriction was not provided to Franciscan because Rose directed them not to provide the information.

The evidence indicates that Oliphant and Ball did not promptly respond to several of Rose's emails asking for an update on the status of the open position and whether they needed additional information. However, this same evidence also indicates that during this time period they were seeking direction from the Human Resources department concerning the situation. Once direction was provided by Human Resources, Ball and Clark (from Human Resources) each communicated with Rose about the work restriction and her various options.

While Rose asserts that Dr. Young's office told Franciscan that it would provide the clarifying information that Franciscan sought if Franciscan provided a HIPAA release, the evidence on which Rose relies states the opposite. Dr. Young's staff informed Franciscan, "We

cannot discuss anything on behalf of [Rose] with [you] unless [Rose] releases in writing that we can talk to [you]." (Filing No. 35-12 at 4.) The direction to Franciscan was not that information would be provided if Franciscan provided a HIPAA release. Rather, the direction to Franciscan was that information would not be provided unless Rose provided a HIPAA release. Thus, Franciscan cannot be blamed for a breakdown in the interactive process for not obtaining a HIPAA release because it was told and understood that Rose had to provide a HIPAA release.

As the Court has explained above, the evidence shows that Rose failed to fulfill her obligations in the interactive process by clarifying the extent of her medical restrictions, and Franciscan cannot be held liable for failing to put her in a position it believed would exceed those restrictions. Based on Dr. Young's work restriction note, Franciscan believed that Rose was limited to working in a .8 FTE status. Because Rose already was working in a .5 FTE position that she did not want to give up, Franciscan determined that Rose was not a qualified individual for the .8 FTE position for which she applied. Providing that second job position would have caused Rose to have a 1.3 FTE status and to exceed her .8 FTE work restriction prescribed by Dr. Young. Summary judgment in favor of Franciscan is appropriate because Rose was not a "qualified individual," and she caused the breakdown in the interactive process.

### 2. Evidence to Support the Elements of an ADA Claim

Even if Rose could show by the designated evidence that she was a qualified individual with a disability and that she did not cause the breakdown in the interactive process, summary judgment still would be appropriate in this case because the evidence does not support the elements of an ADA claim.

To support an ADA claim, a plaintiff must show, "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation;

and (3) her employer took an adverse job action against her because of her disability or without making a reasonable accommodation for it." *Basden*, 714 F.3d at 1037.

A plaintiff may establish a *prima facie* case of disability discrimination by showing: "(1) [s]he is disabled under the ADA; (2) [s]he was meeting [her] employer's legitimate employment expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011). Upon such a showing, the defendant must "identify a legitimate, non-discriminatory reason for its employment decision," and if the defendant satisfies this requirement, the plaintiff must then "prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.*

Regardless of whether a plaintiff uses the direct method of proof, indirect method, or both methods to support their claim, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* The sole question that matters is whether a reasonable juror could conclude that the plaintiff would not have suffered the adverse employment action if she was not disabled and everything else had remained the same. *See id.* at 764; *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F. 3d 734, 736–37 (7th Cir. 1994).

Franciscan argues there is no direct or circumstantial evidence that suggests a discriminatory motive for not allowing Rose to have the .8 FTE position for which she applied. There is no evidence that the position was not offered because of Rose's disability. Additionally, Franciscan asserts that Rose has no evidence of similarly situated employees without a disability who were treated more favorably than Rose. Franciscan notes that it offered a legitimate, non-discriminatory reason for not offering the .8 FTE position to Rose—her doctor limited her work to .8 FTE status and she already was working another .5 FTE position—and Rose cannot show that this reason was a pretext for Franciscan's discriminatory conduct.

As it relates to the issue of pretext, Franciscan asserts the evidence shows it honestly believed Dr. Young's work restriction limited Rose to .8 FTE status inclusive of all her positions, including the .5 FTE Imaging Center position. Franciscan argues that, at most, the evidence shows Franciscan was mistaken in its understanding of Dr. Young's note, and Franciscan points out that "pretext . . . is a deliberate false-hood. An honest mistake, however dumb, is not [pretext], and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (citations omitted).

In response, Rose argues Franciscan's proffered reason for not offering her the .8 FTE position was a pretext for discrimination. She asserts that nobody at Franciscan pursued obtaining a HIPAA release to seek clarification from Dr. Young's office regarding the work restriction. Rose asserts that nobody directly asked her for clarification about the work restriction. Instead, Franciscan employees told Rose in conclusory fashion that the work restriction applied to all her positions, including the Imaging Center position. Rose argues that Dr. Young admitted in his deposition that Franciscan's interpretation of his note was a mistaken assumption, and he would have corrected that misinterpretation if a HIPAA release had been provided.

Rose argues that pretext also can be drawn from Franciscan's shifting explanation about its understanding of the .8 FTE work restriction, where Oliphant asserted Dr. Young would not clarify what the restriction applied to and Jones, in her EEOC response statement, asserted that Dr. Young confirmed the restriction applied to all positions held by Rose (*see* Filing No. 35-23 at 3). Rose asserts that the Court should reject Franciscan's explanation that the discrepancy was an honest mistake by Jones.

Regarding similarly situated employees without a disability being treated more favorably, Rose notes that the position for which she applied was given to Mary Ann Whitney, a fellow Franciscan coworker. Rose asserts:

> Rose can attest to the fact that Whitney does not readily display or report any signs of suffering from a disability. Rose worked with Whitney. At no time did Whitney disclose an[y] disability to Rose, and Rose did not observe any outward symptoms of any condition. Given Rose's own physical ailments, it is reasonable to infer that if Whitney had such a condition she would have confided in Rose. She did not because she is not disabled.

(Filing No. 42 at 25).

Franciscan replies that Rose fails to meet her burden of showing a comparator employee because "[o]ther than identifying Whitney *by name*, Rose fails to come forward with any other admissible evidence of how Whitney was similarly situated to Rose or how Whitney received systematically received [sic] better treatment." (Filing No. 54 at 13.) (Emphasis in original.) Franciscan asserts that Rose's attempt fails because she only provides speculation and conjecture, which cannot carry a plaintiff's burden at the summary judgment stage. Franciscan argues that it is not enough for Rose to speculate that Whitney does not readily display signs of a disability and that, because Rose has her own physical ailments, it is reasonable to infer that Whitney would have confided in Rose if Whitney did have a disability.

The Court determines that Rose has not presented sufficient evidence to support the element of a similarly situated employee to survive summary judgment. Rose has presented only speculation and guesswork that does not provide adequate evidence to show comparator employees without a disability received better treatment.

Regarding the issue of pretext, the Court agrees with Franciscan that Rose has not come forward with evidence to show that its proffered reason for not offering Rose the .8 FTE position was a lie or deliberate falsehood. Rose argued that Franciscan should have been more diligent in obtaining a HIPAA release to seek clarification from Dr. Young's office, and nobody directly asked her for clarification about the work restriction. Rather, Franciscan employees told Rose in "conclusory fashion" that the work restriction applied to all her positions. This does not show that Franciscan lied about its reason for not offering Rose the position. Instead, this shows that Franciscan determined that Dr. Young's work restriction applied to all of Rose's positions after it could not initially get clarification from Dr. Young. Then Franciscan consistently followed its interpretation that the restriction applied to all of Rose's positions.

While Jones incorrectly represented in Franciscan's EEOC response statement that Dr. Young had confirmed the work restriction applied to all positions held by Rose, Franciscan has provided competent evidence that Jones' statement was an honest mistake because she failed to communicate with employees more directly involved in Rose's situation (*see* Filing No. 35-3 at 3–4). Rose's response supports Franciscan's position that Jones failed to communicate with employees more directly involved in her situation. However, Rose fails to provide evidence that shows Jones' incorrect statement was not just an honest mistake.

Importantly, Jones' misstatement about Dr. Young confirming the work restriction does not cast doubt on, conflict with, or change the underlying reason provided by Franciscan for why

it did not offer the .8 FTE position to Rose. Franciscan's reason was that Dr. Young's work restriction limited Rose to .8 FTE status, she already was working in a .5 FTE position, and the restriction applied to all of her positions. Jones similarly stated that the .8 FTE work restriction applied to all of Rose's positions, albeit, incorrectly stating the Dr. Young confirmed such. There is no evidence that indicates Franciscan's legitimate, non-discriminatory reason for not offering the .8 FTE position to Rose was a pretext for any discriminatory conduct.

## IV.   CONCLUSION

For the foregoing reasons, Defendant Franciscan Alliance, Inc.'s Motion for Summary Judgment (Filing No. 35) is **GRANTED**, and Plaintiff Mary Rose's ADA claim is **dismissed**. Final judgment will issue under separate order.

**SO ORDERED.**

Date:  6/4/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Christopher S. Wolcott
WOLCOTT LAW FIRM LLC
indy2buck@hotmail.com

Nicholas Scott Johnston
HALL, RENDER, KILLIAN, HEATH & LYMAN, PC
njohnston@hallrender.com

Dana Eugene Stutzman
HALL, RENDER, KILLIAN, HEATH & LYMAN, PC
dstutzman@hallrender.com